**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MILDRED D. AL-KHALILI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:12-cv-0347** |
| **v.** | ) | **Judge Nixon/Brown** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of the

Social Security Administration (the "SSA"), through its Commissioner, denying Plaintiff's

application for supplemental security income ("SSI") under Title XVI of the Social Security Act

(the "Act"), 42 U.S.C. §§ 1382, 1382c. For the reasons explained below, the Magistrate Judge

**RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (DE 11) be

**DENIED** and that the Commissioner's decision be **AFFIRMED**.

## I.    PROCEDURAL HISTORY

Plaintiff applied for SSI and disability insurance benefits ("DIB") on June 26, 2007. (DE

9, pp. 55, 59).[1] Disability Determination Services ("DDS") denied the DIB application on July

27, 2007[2] and denied the SSI application on December 7, 2007. (DE 9, pp. 55-60, 63-65).

Plaintiff requested a reconsideration of her SSI application on January 31, 2008 (DE 9, pp. 68-

69), which DDS again denied on April 10, 2008. (DE 9, pp. 61-62, 69-70).

---

[1] Page citations refer to the Bates Stamp on each page of the Administrative Record.

[2] Plaintiff did not further pursue her DIB application.

On June 5, 2008, Plaintiff requested a hearing by an administrative law judge ("ALJ"). (DE 9, p. 71). Present at Plaintiff's hearing on April 23, 2010 were her attorney—Mark Pierce—and a vocational expert ("VE")—Rebecca Williams. (DE 9, p. 26). The ALJ issued an unfavorable decision on May 21, 2010, based on the following findings of fact and conclusions of law:

> (1) The claimant has not engaged in substantial gainful activity ("SGA") since the alleged onset date of April 1, 2005.

> (2) The claimant has the following severe combination of impairments: cervical spondylosis,[3] degenerative disc disease[4] with cervical and lumbar radiculopathy,[5] arthritis, hypertension,[6] headaches, stomach ulcers, obesity, and a history of temporomandibular joint ("TMJ") surgery.[7] These conditions do not singly or combined meet or medically equal an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1.

> (3) The claimant has the residual functional capacity ("RFC") to lift fifteen pounds occasionally, lift five to ten pounds frequently, stand or walk for four hours in an eight-hour workday, and sit for six hours in an eight-hour workday.

> (4) The claimant is unable to perform any past relevant work.

> (5) The claimant was forty-seven years old at the alleged onset date, described as a younger individual. She is currently fifty-three years old, described as closely approaching advanced age.

> (6) The claimant has a tenth grade education and is able to communicate in English.

---

[3] "Degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or [an abnormal touch sensation] radiating along the upper limbs." Elsevier Saunders, Dorland's Illustrated Medical Dictionary 1383, 1754 (32nd ed. 2012).

[4] Invertebral disc disease. Dan J. Tennenhouse, Attorneys Medical Deskbook § 5:6 (4th ed. 2012).

[5] Both cervical and lumbar radiculopathy result from diseased nerve roots. Cervical radiculopathy is often accompanied by pain in the neck or shoulders. Lumbar radiculopathy may cause lower back pain and abnormal touch sensations. Elsevier Saunders, Dorland's Illustrated Medical Dictionary 1383, 1571 (32nd ed. 2012).

[6] High blood pressure. Id. at 896.

[7] Surgery on the side of the jaw. See id. at 1101, 1880.

> (7) Transferability of job skills is not material to the determination of disability because using the Medical Vocational Rules ("grids") as a framework supports a finding that the claimant is "not disabled."
>
> (8) Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
>
> (9) The claimant has not been under a disability as defined in the Act since June 26, 2007, the date the application was filed.

(DE 9, pp. 11-21).

On July 9, 2010, Plaintiff requested that the Appeals Council review the hearing decision, but the Council denied this request on February 8, 2012. (DE 9, pp. 1-6, 8). Plaintiff then filed a complaint in this Court on April 5, 2012. (DE 1). Defendant answered (DE 8) and filed the administrative record on June 19, 2012. (DE 9). On June 20, 2012, the Magistrate Judge directed Plaintiff to file a motion for judgment on the administrative record and ordered Defendant to respond. (DE 10).

Plaintiff subsequently filed her motion on July 19, 2012 (DE 11), and Defendant responded on August 16, 2012. (DE 12). Plaintiff replied on September 4, 2012 (DE 13), and with the permission of the Court (DE 15), Defendant filed a sur-reply on September 19, 2012. (DE 16). Though Plaintiff moved to strike the sur-reply on September 20, 2012 (DE 17), the Magistrate Judge denied the motion on that same day. (DE 18). The Magistrate Judge noted that Plaintiff, in her motion to strike, effectively filed a sur-sur reply which would be considered.

## II.    REVIEW OF THE RECORD

### A.  MEDICAL EVIDENCE

#### 1.  Dr. Bennet – Western Kentucky Diagnostic Imaging

On February 17, 2005, Ashley Bennet, M.D. ("Dr. Bennet") at Western Kentucky Diagnostic Imaging in Bowling Green, Kentucky, performed a MRI exam on Plaintiff's left

knee. (DE 9, p. 201). The MRI revealed a bone bruise and mild strain along the medial collateral ligament.[8] (DE 9, p. 201).

### 2. Dr. Patton – Western Kentucky Orthopaedic Associates

Christopher Patton, M.D. ("Dr. Patton") from Western Kentucky Orthopaedic Associates in Bowling Green, Kentucky, treated Plaintiff from February 22, 2005 to August 23, 2005. (DE 9, pp. 189-200). Plaintiff reported pain in her left knee on February 22, 2005, which Dr. Patton diagnosed as left knee pes anserine bursitis[9] and possibly early osteoarthritis.[10] (DE 9, p. 197). Reviewing a MRI of Plaintiff's knee, Dr. Patton noted "inflammatory changes along the medial proximal tibia" and administered a cortisone shot into the pes bursa. (DE 9, p. 197).

On March 1, 2005, Plaintiff reported that the cortisone shot relieved the pain for several days and that it returned to a lesser degree. (DE 9, p. 195). After an appointment on March 14, 2005, Dr. Patton reported that Plaintiff walked without limping, had mild tenderness along the pes anserine bursa, and that her overall range of movement was good. (DE 9, p. 193).

Plaintiff did not report knee pain again until her meeting with Dr. Patton on April 29, 2005. (DE 9, p. 191). Dr. Patton diagnosed Plaintiff with mild bilateral knee osteoarthritis and recurrent pes anserine bursal tendinitis in her left knee and administered another cortisone injection into her knee. (DE 9, p. 191). He confirmed this diagnosis on August 23, 2005, reporting that Plaintiff had osteoarthritis in both knees and recurrent pes anserine bursal tendinitis in her left knee which made it difficult for Plaintiff to use stairs. (DE 9, p. 190).

---

[8] A stabilizing ligament in the knee. Dan J. Tennenhouse, Attorneys Medical Deskbook § 5:15 (4th ed. 2012).

[9] An inflamed fluid-filled cavity on the inner side of the knee. Elsevier Saunders, Dorland's Illustrated Medical Dictionary 262, 265 (32nd ed. 2012).

[10] A degenerative joint disease generally accompanied by pain. *Id.* at 1344.

### 3. Dr. Isaac – Center for Spine, Joint, and Neuromuscular Rehabilitation

Victor Isaac, M.D. ("Dr. Isaac") from Center for Spine, Joint, and Neuromuscular Rehabilitation in Hermitage, Tennessee, treated Plaintiff from September 12, 2006 to April 15, 2010. (DE 9, pp. 183, 202-221, 303-317). On September 12, 2006, Plaintiff complained of neck, shoulder, arm, and lower back pain. (DE 9, p. 219). Plaintiff stated that her back pain increased with prolonged standing or walking. (DE 9, p. 219). Aside from a small disc protrusion, Plaintiff had a normal cervical spine.[11] (DE 9, p. 219). From September 12, 2006 to August 8, 2007, Dr. Isaac noted that Plaintiff's range of motion and extension were limited, but he reported no gross deformity or scoliosis.[12] He was under the impression that Plaintiff suffered from: cervical muscle strain, cervical radiculopathy, lumbago,[13] lumbar radiculopathy, displacement,[14] cervical disc without myelopathy,[15] cervical spondylosis, and pain in the forearm joint. (DE 9, pp. 205-220). Plaintiff was tender in several regions, but the straight leg raise test,[16] Gaenslen's test,[17] FABER test,[18] Spurling's test,[19] and facet loading maneuvers which included standing extension and rotation were all negative. (DE 9, pp. 205-210, 213-220).

---

[11] The part of the spine comprising the cervical vertebrae. *Id.* at 1749.

[12] A deviation from a straight vertical spine. *Id.* at 1681.

[13] A nonmedical term for lower back pain. *Id.* at 1076.

[14] Malposition. *Id.* at 554.

[15] Functional disturbances or pathological changes in the cervical spinal cord. *Id.* at 1220.

[16] While on her back, the patient raises a straight leg until it reaches ninety degrees. The test is positive if the patient cannot raise each leg to the same degree or if the patient cannot reach ninety degrees. Ann G. Hirschmann, Medical Proof of Social Security Disability § 2:5 (2nd ed. 2012).

[17] Test used to detect musculoskeletal abnormalities and inflammation of the lumbar vertebrae. The test is positive if the patient feels pain when one hip joint is flexed and the other is extended. *See* 3 Lane Goldstein Trial Technique § 15:43 (3d ed. 2013).

[18] Test used to detect problems in the sacroiliac joint of the hip. While the patient lies on her back, "the examiner flexes the patient's knee and thigh and places the outer side of the patient's ankle on her opposite kneecap. Then the

Plaintiff complained of pain in her neck, right shoulder, and lower back on September 28, 2006 and October 19, 2006. (DE 9, pp. 215, 217). She stated that the pain in her lower back radiated to her thigh and increased with prolonged standing and walking. (DE 9, pp. 215, 217). However, on these visits, Dr. Isaac noted that Plaintiff's medications worked well and without any side effects. (DE 9, pp. 215, 217).

On November 2, 2006, Plaintiff stated that her radiating lower back pain limited her walking and sleeping but that a prescribed Medrol dose pack significantly relieved this pain. (DE 9, p. 213). Again, Dr. Isaac noted that Plaintiff's medication worked well and without side effects. (DE 9, p. 213). Several months later, on March 12, 2007, Plaintiff complained of pain in her right wrist which increased with heavy lifting. (DE 9, p. 211). On June 27, 2007, Plaintiff again complained of radiating lower back pain (DE 9, p. 209), and Dr. Isaac encouraged Plaintiff to engage in routine aerobic conditioning, stretching, and strengthening. (DE 9, p. 210). Plaintiff told Dr. Isaac that the pain had improved by forty percent on July 11, 2007. (DE 9, p. 207). However, on August 8, 2007, Plaintiff again reported increased lower back pain. (DE 9, p. 205).

Plaintiff further reported lower back pain from April 2008 to August 2008. (DE 0, pp. 310-317). She denied radicular symptoms, including pain, paresthesia,[20] and weakness. (DE 9, pp. 206, 310, 312, 314, 316). Dr. Isaac noted the impression of lumbago, degeneration of the lumbar/lumbosacrac disc, lumbar spondylosis,[21] myofacial pain syndrome,[22] cervical muscle

---

knee of the patient's flexed (bent) extremity is depressed." *See* 3 Lane Goldstein Trial Technique § 15:43 (3d ed. 2013).

[19] Test used to assess radicular pain. The test is positive if the patient feels pain in her arm while her head is turned and downward pressure is exerted upon it. Stephen G. Brown & Steven Pitt, The Claim Adjuster's Automobile Liability Handbook § 11:9 (2012).

[20] An abnormal touch sensation. Elsevier Saunders, Dorland's Illustrated Medical Dictionary 1383 (32nd ed. 2012).

[21] "[D]egenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure." *Id.* at 1754.

strain, cervical radiculopathy, displacement, cervical disc without myelopathy, cervical

spondylosis, decondition[23] syndrome, and hypertension. (DE 9, pp. 306, 310, 312, 314, 316).

During an appointment on September 10, 2008, Plaintiff reported that William Schooley,

M.D. ("Dr. Schooley") had recommended surgery, that her lower back pain increased with

sitting, standing, and walking, and that the pain eased if she lay down. (DE 9, p. 306).

### 4. Dr. Son – Center for Spine, Joint, and Neuromuscular Rehabilitation

On November 14, 2008, Le Son, M.D. ("Dr. Son") from Center for Spine, Joint, and

Neuromuscular Rehabilitation performed an incomplete discogram[24] on Plaintiff because

Plaintiff could not tolerate the procedure. (DE 9, pp. 304-305).

### 5. Dr. Mazzella – Hermitage Imaging

On September 13, 2006, Plaintiff underwent an MRI lumber spine[25] exam. (DE 9, pp.

202-203). The physician, John Mazzella, M.D. ("Dr. Mazzella") from Hermitage Imaging in

Hermitage, Tennessee, found normal lumbar lordosis;[26] mild to moderate left and mild right

foraminal narrowing in L4/5 from left eccentric annular bulge and facet degenerative joint

disease;[27] left eccentric annular bulge with left foraminal disc protrusion and annular tear in

---

[22] A disorder characterized by musculoskeletal tenderness, commonly of the tempormandibular joint. Kristyn S. Appleby & Joanne Tarver, Med, Records Rev. s § 6.17 (2010).

[23] A "change in cardiovascular function after prolonged periods of weightlessness." Elsevier Saunders, Dorland's Illustrated Medical Dictionary 475 (32nd ed. 2012).

[24] A radiograph of the intervertebral disc. Id. at 547.

[25] The part of the spine comprising the lumbar vertebrae. Id. at 1749.

[26] The "dorsally concave curvature of the lumbar vertebral column when seen from the side." Id. at 1074.

[27] Osteoarthritis. Id. at 532.

L5/S1; mild to moderate left and mild right foraminal stenosis[28] in L5/S1; and no central canal stenosis. (DE 9, p. 202).

### 6. Dr. Enayat - Summit Medical Center

Abdul Enayat, M.D. ("Dr. Enayat") from Summit Medical Center treated Plaintiff from March 17, 2006 to September 15, 2009. (DE 9, pp. 319-332). Plaintiff complained of neck pain on May 15 and 19, 2006. (DE 9, pp. 330-331). On September 1, 2006, Plaintiff complained of back, neck, and hip pain. (DE 9, p. 329). Dr. Enayat saw Plaintiff on July 28, 2008 and September 14, 2009 to treat her low back pain. (DE 9, pp. 322, 324).

### 7. Additional Doctors from Summit Medical Center

Various physicians treated Plaintiff at Summit Medical Center from June 13, 2004 to February 2, 2008 and from July 11, 2009 to September 25, 2009. (DE 9, pp. 237-268; 334-350).

James Hitchman, M.D. ("Dr. Hitchman") examined Plaintiff's cervical spine on May 16, 2006, and concluded that it was normal. (DE 9, p. 257). On May 24, 2006, Stephen Humphrey, M.D. ("Dr. Humphrey") conducted a MRI cervical spine on Plaintiff, and he was under the impression that Plaintiff had a small central disc protrusion at C3-C4 which was not producing any significant compromise of the central canal. (DE 9, pp. 255-256). J. Michael Lynch, M.D. ("Dr. Lynch") treated Plaintiff on October 17, 2006 regarding complaints of low back pain, and he diagnosed her with lumbar disk protrusion.[29] (DE 9, pp. 249-250).

On March 13, 2007, J. Michael Friday, M.D. ("Dr. Friday") from the Department of Medical Imaging at Summit Medical Center examined Plaintiff's right wrist and concluded that the results were normal. (DE 9, p. 254). Robert Roth, M.D., D.O. ("Dr. Roth") treated Plaintiff

---

[28] Stenosis refers to an abnormal narrowing of a duct or canal. *Id*. at 1769.

[29] A herniated lower intervertebral disk. *Id*. at 546, 1076.

on April 1, 2007 regarding complaints of blood in her stool, and Dr. Roth determined that differential diagnoses included diverticulosis,[30] diverticulitis,[31] or a polyp.[32] (DE 9, pp. 246-248). On June 6, 2007, Dr. Roth treated Plaintiff's complaints of a headache, dizziness, and shoulder muscle spasms and was under the impression of migrainous headache and cervical torticollis.[33] (DE 9, pp. 241-243).

Benjamin Griffin, M.D. ("Dr. Griffin") in the Department of Medical Imagining took a MRI of Plaintiff's lumbar spine on August 18, 2008. (DE 9, pp. 308-309). The MRI revealed: a small left foraminal disc protrusion with moderate left neuroforaminal narrowing on L4-L5; a very small left paracentral left foraminal disc protrusion with secondary mild to moderate left neuroforaminal narrowing secondary to the protrusion and mild to moderate facet arthropathy[34] on L5-S1; posterior annular tears on L4-L5 and L5-S1; degenerative disc disease, including desiccation at the L4-S1 levels; and other degenerative changes of the lumbar spine. (DE 9, p. 309).

On July 11, 2009, Plaintiff complained that her back pain was moderate in degree, worsened by bending and lifting, and was located in her upper lumbar spine and left thigh. (DE 9, p. 344). Jason Henry, PA-C[35] noted tenderness in Plaintiff's lower lumbar area, moderately limited range of movement, and decreased flexion and extension. (DE 9, p. 345). He discharged

---

[30] The presence of a hernia-created pouch without inflammation. *Id*. at 558.

[31] Inflammation of a hernia-created pouch. *Id*. at 1492.

[32] An abnormal growth from a mucous membrane. *Id*.

[33] An abnormal contraction of muscles in the neck. *Id*. at 1941.

[34] A type of spondylarthritis centered in facet joints, with disk degeneration and pain. *Id*. at 158, 1344.

[35] Certified Physician Assistant.

Plaintiff with prescriptions for Ultram and a Medrol dosepack and instructions to ice her back and limit lifting. (DE 9, p. 345). Plaintiff could walk and drive during this visit. (DE 9, p. 343).

### 8.  Dr. Jacobson and Dr. Press - Vanderbilt Medical University

Plaintiff was treated at Vanderbilt Medical University from January 12, 2008 to June 12, 2009. (DE 9, pp. 270-274, 284-302, 351-366). In response to Plaintiff's complaint of a constant headache, on January 13, 2008, Gregory Jacobson, M.D. ("Dr. Jacobson") performed a head CT on Plaintiff and noted no acute intracranial findings. (DE 9, pp. 272, 274). He diagnosed acute exacerbation of chronic headaches and jaw pain. (DE 9, p. 274). Plaintiff was also treated for facial pain and underwent surgery to correct her TMJ on April 9, 2008. (DE 9, pp. 270-272, 284-288, 294-295). She reported facial pain in 2009, but Steven Press, D.D.S. ("Dr. Press") believed she was doing well. (DE 9, p. 351-353).

### 9.  Dr. Schooley - Neurosurgical Associates

From November 4, 2008 to July 21, 2009, Dr. Schooley from Neurosurgical Associates in Nashville, Tennessee, treated Plaintiff. (DE 9, pp. 367-370). Dr. Schooley wrote to Dr. Isaac on November 4, 2008, noting that Plaintiff had been diagnosed with lumbar spondylosis and worsening back and leg pain. (DE 9, p. 370).

### 10. Dr. Pope – Middle Tennessee Medical Center

On March 16, 2009, Stan Pope, M.D. ("Dr. Pope") from Middle Tennessee Medical Center in Murfreesboro, Tennessee, conducted a MRI on Plaintiff's lumbar spine. (DE 9, pp. 368-369). Dr. Pope was under the impression of: (1) L5/S1 broad-based posterior disc herniation with hypertrophy of the facet/ligamentum resulting in moderate left and mild right neuroforaminal narrowing and mild displacement of the traversing left S1 nerve root; (2) a suggested annular tear at the left posterolateral aspect of the L5/S1 disc; (3) mild diffuse annular

disc herniation at L3/4 and L4/5 with mild neuroframinal narrowing resulting bilaterally at the L4/5 level; and (4) multilevel facet hypertrophic osteoarthropathy.[36] (DE 9, p. 369).

**11. Dr. Spellman – Premier Radiology**

On July 21, 2009, Dr. Schooley referred Plaintiff to Michael Spellman, M.D. ("Dr. Spellman") at Premier Radiology in Nashville, Tennessee, for a MRI of Plaintiff's lumbar spine. (DE 9, p. 367). Dr. Spellman was under the impression of multilevel lumbar spondylosis and mild bilateral neural foraminal stenosis of L4-L5 and L5-S1. (De 9, p. 367).

**A. CONSULTATIVE ASSESSMENTS**

**1. Dr. Pinga – Examining Physician**

Emelito Pinga, M.D. ("Dr. Pinga") from Chattanooga Family Practice in Murfreesboro, Tennessee, examined Plaintiff on October 17, 2007. (DE 9, pp. 222-228). After the examination, Dr. Pinga was under the impression that Plaintiff had (1) degenerative arthritis of the lumbar spine and degenerative disk disease treated with Tizanidine; (2) degenerative arthritis of the right shoulder joint treated with Tizanidine; (3) degenerative arthritis of the right and left knee joint treated with Tizanidine and steroid injections; (4) degenerative arthritis of the right wrist joint treated with Tizanidine; (5) hypertension poorly controlled by Hydrochlorothiazide; and (6) obesity. (DE 9, p. 227). Dr. Pinga determined that Plaintiff could sit for six hours in an eight-hour workday, walk or stand for four hours in an eight-hour workday, and would be limited to frequently lifting five to ten pound weights and occasionally lifting fifteen pound weights. (DE 9, pp. 227-228).

**2. Dr. Ryan – Physical RFC**

On December 7, 2007, Michael Ryan, M.D. ("Dr. Ryan") completed Plaintiff's physical RFC assessment. (DE 9, pp. 229-236). He determined that Plaintiff could occasionally lift or

---

[36] "[D]isease of the joints and bones." *Id.* at 1345.

carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and push or pull without limits. (DE 9, p. 230). He noted that Plaintiff could frequently climb a ramp or stairs, balance, stoop, crouch, and crawl, and could occasionally kneel and climb a ladder, a rope, or a scaffold. (DE 9, p. 231). He noted no manipulative, visual, communicative, or environmental limitations. (DE 9, pp. 232-233). Dr. Ryan found Plaintiff's symptoms partially credible and Dr. Pinga's assessment too restrictive because Plaintiff had minimal medical imaged findings, a mildly decreased range of movement, and a normal neurological exam. (DE 9, pp. 234-235).

### 3. Ms. Degrella – Vocational Consultant

On December 7, 2007, vocational consultant Nancy Degrella ("Ms. Degrella") completed a vocational analysis worksheet for Plaintiff. (DE 9, pp. 158-160). Her RFC analysis matched that of Dr. Ryan. (DE 9, pp. 158-160, 229-236). She also determined that Plaintiff could perform her past work as an assembly line worker as Plaintiff had described it. (DE 9, p. 159).

### 4. Dr. Walwyn – Physical RFC

Lloyd Walwyn, M.D. ("Dr. Walwyn") conducted a physical RFC assessment on April 10, 2008, which matched that of Dr. Ryan. (DE 9, pp. 229-236, 275-282).

## B. PLAINTIFF'S TESTIMONY

Plaintiff described a normal day as waking up, using the bathroom, brushing her teeth, showering, eating at least two meals, and watching television in her room. (DE 9, pp. 34-35). She testified that she went to church, occasionally went grocery shopping, and did not do other household duties. (DE 9, pp. 32, 35-36). Although she had a driver's license, she testified that she did not drive because it was painful. (DE 9, p. 32).

Plaintiff testified that she had pain in her lower back, legs, knees, and neck. (DE 9, p. 33). She rated this pain, while on pain medication, a nine out of ten with ten as the most painful. (DE 9, pp. 33-34). She stated that she was in pain every day and needed to lie down, sit up, and recline throughout the day. (DE 9, p. 34). She later testified that she had been in bed for at least two to three weeks at a time because of her back and leg pain and that nothing made her pain better even though she used medication and applied heat and ice. (DE 9, pp. 38, 41). She additionally testified that her medications caused her to be drowsy and nauseated. (DE 9, p. 33).

Plaintiff further testified that she suffered from two types of headaches: those caused by her TMJ and those caused by her neck. (DE 9, p. 38). She testified that she had these headaches constantly and that her medication completely relieved the TMJ-induced headaches and temporarily relieved the neck-induced headaches. (DE 9, pp. 38-39). Plaintiff also testified that she had problems with her elevated blood pressure, swelling in her legs and feet, esophageal spasms, and a stomach ulcer. (DE 9, pp. 39-40). According to Plaintiff, this constant pain prevented her from concentrating and completing simple tasks. (DE 9, p. 41).

### C. VOCATIONAL EXPERT'S TESTIMONY

The VE testified that Plaintiff's past work included that of (1) an electronics tester which is classified as light and semi-skilled work; (2) a cosmetics salesperson which is light and semi-skilled work; (3) a hand packager which is medium and unskilled work that Plaintiff performed at a light level; and (4) a salesperson which is light and semi-skilled work. (DE 9, pp. 45-46). The VE additionally testified that Plaintiff had no transferable job skills. (DE 9, p. 46).

The ALJ asked whether past relevant work was available for individuals with the same age, education, and work experience as Plaintiff who could carry ten pounds frequently, twenty pounds occasionally, stand and walk for six hours in an eight-hour workday, sit for six hours in

an eight-hour workday, push and pull without limits, occasionally climb ladders, ropes, scaffolds, and occasionally kneel. (DE 9, p. 46). The VE testified that Plaintiff's work as a cosmetic salesperson, electronics tester, and salesperson would be available. (DE 9, p. 47). The VE also testified that Plaintiff's hand packager job would be available as Plaintiff had performed it but not as it was described in the *Dictionary of Occupational Titles* (the "DOT"). (DE 9, p. 47).

In response to the ALJ's next hypothetical, the VE testified that no past relevant work would be available for an individual with Plaintiff's age, education, and work experience who could sit six hours in an eight-hour workday, walk or stand for four hours in an eight-hour workday, frequently lift five to ten pounds, and occasionally lift fifteen pounds. (DE 9, p. 47). However, the VE testified that this individual could perform a limited range of light work and a full range of sedentary work. (DE 9, p. 47). At the light level were sewing machine operator, production assembler with the numbers reduced because of the option to sit, and assembly press operator. (DE 9, pp. 47-48). At the sedentary level were cuff folder, film touchup inspector, and buckle wire inspector. (DE 9, pp. 48-49).

The VE testified that sedentary jobs would be available for an individual with Plaintiff's age, education, and work experience who could sit for six hours in an eight-hour workday, walk or stand for four hours in an eight-hour workday with an at-will sit-stand option, frequently lift five to ten pound weights, and occasionally lift fifteen pounds. (DE 9, p. 49). This individual also could not climb ramps, stairs, ladders, ropes, or scaffolds; could occasionally stoop; could rarely kneel, crouch, crawl; needed to avoid concentrated exposure to vibration; could have moderate exposure to operational control of moving machinery and unprotected heights; and needed to work in a low-stress job with occasional decision-making and changes in the work setting. (DE 9, pp. 49-50).

The VE testified that no full-time work was available for individuals who needed to lie down or recline at various times during the day. (DE 9, p. 50).

### III.    CONCLUSIONS OF LAW

#### A.  STANDARD OF REVIEW

This Court determines whether the Commissioner's final decision is supported by substantial evidence and whether the Commissioner complied with the correct legal standards in making that decision. 42 U.S.C. § 405(g); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013), reh'g denied (May 2, 2013). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Even if substantial evidence may support an opposite conclusion, this Court defers to the Commissioner's decision if the Commissioner had more than a "mere scintilla of evidence but less than a preponderance." *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Failure to comply with the proper legal standards may imply a lack of substantial evidence. *Gayheart*, 710 F.3d at 374.

#### B.  PROCEEDINGS AT THE ADMINISTRATIVE LEVEL

A claimant is "disabled" within the meaning of the Act if an extended medically determinable physical or mental impairment prevents her from engaging in SGA. 42 U.S.C. §§ 1381a; 1382c(a)(3)(A). The SSA assesses disability under a five-step test:

(1) If the claimant is engaged in SGA, the claimant is not disabled.

(2) If the claimant's physical or mental impairment, or combination of impairments, is not severe or does not meet the duration requirement, the claimant is not disabled.

(3) If the claimant's impairment(s) meets or equals a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1, the claimant is presumed disabled, and the inquiry ends.

(4) Based on the claimant's RFC, if the claimant can still perform past relevant work, the claimant is not disabled.

(5) If the claimant's RFC, age, education, and work experience indicate that the claimant can perform other work, the claimant is not disabled.

20 C.F.R. § 416.920(a)(4).

The claimant bears the burden of proof from step one through step four. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). At step five, the burden shifts to the SSA, and it may meet this burden by providing evidence of a "significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile." *Id.*

### C. PLAINTIFF'S STATEMENT OF ERRORS

Plaintiff first asserts that the ALJ erred in assessing Plaintiff's RFC, contending that: (1) the decision should be reversed for failure to provide "function by function" RFC findings; (2) the ALJ failed to evaluate the VE's testimony under SSR 00-4p; (3) by not mentioning postural or manipulative capacities in a hypothetical to the VE, the ALJ meant that Plaintiff had no such capacities; (4) the ALJ did not appropriately consider Plaintiff's manipulative and (5) postural limitations; and (6) the ALJ erred in assessing how long Plaintiff could sit, stand, and walk and whether Plaintiff's RFC required a "sit-stand" option. (DE 11-1 pp. 3-5; DE 13, p. 2).

Secondary to this argument, Plaintiff argues that she was entitled to a partially favorable decision under Rule 201.10 of the grids. (DE 11-1, pp. 5-21).

### D. PLAINTIFF'S RFC

Upon consulting the entire record, the ALJ determines the claimant's RFC by assessing her mental and physical abilities. 20 C.F.R. §§ 416.945(a); 416.946(c). The ALJ considers all of the claimant's medically determinable impairments, severe and non-severe, mental and physical, exertional and nonexertional. 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 416.945; SSR 96-8p. When

determining the effects of symptoms, including pain, on the claimant's RFC and ability to work, the ALJ follows a two-step process. 20 C.F.R. § 416.929.

First, the ALJ must establish that the claimant suffers from medically determinable impairments which could reasonably be expected to cause the alleged symptoms. 20 C.F.R. § 416.929(b). Second, the ALJ evaluates the intensity and persistence of the symptoms and assesses the extent to which they limit the claimant's ability to work. 20 C.F.R. § 416.929(c). In the second step, the ALJ considers: medical evidence; evidence from treating or non-treating sources; the claimant's daily activities; the location, frequency, and intensity of pain and symptoms; factors precipitating and aggravating the symptoms; the dosage, effectiveness, and side effects of pain medication; other treatments; and other factors concerning the claimant's functional limitations. 20 C.F.R. § 416.929(c)-(d); SSR 96-7p. The ALJ also assesses the claimant's credibility. Because ALJs have the chance to interact with claimants during the hearings, this Court gives great weight to ALJ credibility decisions so long as they are supported by substantial evidence. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). "An ALJ may discount a claimant's credibility where the ALJ finds contradictions among the medical records, claimant's testimony, and other evidence." *Tyrpak v. Astrue*, 858 F. Supp. 2d 872, 877 (N.D. Ohio 2012).

The ALJ established that Plaintiff had medically determinable impairments which could reasonably be expected to cause the alleged symptoms. (DE 9, p. 19). However, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (DE 9, pp. 16, 19-20). In support of this RFC, the ALJ referred to (1) Plaintiff's complaints; medical records from (2) Western Kentucky Orthopaedic Associates, (3) Summit

Medical Center, (4) Vanderbilt Medical Center, and (5) Hermitage Imaging; and reports from (6) Dr. Patton, (7) Dr. Isaac, (8) Dr. Enayat, (9) Dr. Schooley, (10) Dr. Pinga, and (11) the State agency physicians. (DE 9, pp. 16-20).

### 1. Function by Function Assessment

This Circuit does not require a step-by-step narrative of a claimant's functional limitations. *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547-48 (6th Cir. 2002) (citation omitted); *see also Edwards v. Barnhart*, 383 F.Supp.2d 920, 929 (E.D. Mich. 2005). Rather, the ALJ need only "articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Delgado*, 30 F. App'x at 547-48 (citation omitted). Furthermore, the ALJ is not required to "discuss those capacities for which no limitation is alleged." *Id.* at 547. The ALJ satisfied these requirements as discussed in the sections regarding Plaintiff's manipulative, postural, sitting, standing and walking limitations.

### 2. The ALJ Complied with SSR 00-4p

If a VE testifies at a hearing, the ALJ must (1) ask if the VE's testimony conflicts with the DOT, (2) obtain an explanation for the conflict *before relying on the VE's testimony*, and (3) explain the resolution of the conflict in the ALJ's decision. SSR 00-4p (emphasis added). The ALJ satisfactorily complied with these requirements.

Before questioning the VE, the ALJ stated: "I'll assume your testimony . . . is consistent with the [DOT] unless you tell me otherwise" to which the VE agreed. (DE 9, p. 43). During the hearing, the VE vocalized two differences between Plaintiff's vocational abilities and the DOT descriptions. (DE 9, pp. 47-48).

First, the VE indicated that Plaintiff could perform her previous job as a hand packager as Plaintiff described it but not as described in the DOT. (DE 9, p. 47). The ALJ did not pursue an explanation for this conflict, but this omission is no more than harmless error because the ALJ ultimately determined that Plaintiff was precluded from all past relevant work. (DE 9, p. 47). *See Stewart v. Comm'r of Soc. Sec.*, No. 07-15022, 2009 WL 877718, at *12 (E.D. Mich. Mar. 30, 2009) (quoting *Masters v. Astrue*, CIV A 07-123-JBC, 2008 WL 4082965, at *2 (E.D. Ky. Aug. 29, 2008)) ("An error is harmless where it has no bearing on the procedure used or the substance of the ultimate decision.").

Second, in response to the ALJ's hypothetical referencing Plaintiff's actual RFC, the VE explained that the six-hour sitting requirement reduced the number of available production assembler jobs. (DE 9, pp. 47-48). As the ALJ obtained an explanation for this discrepancy and then addressed the erosion of the occupational base in her decision (DE 9, pp. 20-21), the ALJ satisfied the remaining SSR 00-4p requirements.

### 3. Hypotheticals to the VE Must Include Limitations, Not Capacities

Essentially Plaintiff contends that because the ALJ did not mention any postural or manipulative *capacities* when posing a hypothetical to the VE,[37] the ALJ implied that Plaintiff possessed no postural or manipulative capacities. (DE 11-1, p. 4). Plaintiff cites no legal standard for this rationale.

Questions to the VE "must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). These "hypotheticals need only include the limitations that the ALJ deems credible." *Paul v. Astrue*, 827 F. Supp. 2d 739, 746 (E.D. Ky. 2011). It follows that the ALJ is not required to list the claimant's unrestricted capabilities. Thus, when the ALJ did not mention postural or

---

[37] This hypothetical RFC matches the ALJ's ultimate RFC determination. (DE 9, p. 16).

manipulative limitations in the hypothetical at issue (DE 9 p. 47), the ALJ intended the VE to assume no such limitations.

### 4. The ALJ Correctly Assessed Plaintiff's Manipulative Limitations

Plaintiff asserts that her RFC includes manipulative limitations arising out of problems with her right wrist, shoulder, and cervical radiculopathy. (DE 11-1, p. 4). Substantial evidence supports the ALJ's determination that Plaintiff's manipulative abilities are not limited by these impairments.

As far as objective medical evidence goes, radiographs of Plaintiff's wrist showed no abnormalities. (DE 9, p. 254). None of Plaintiff's treating physicians reported that Plaintiff's impairments limited her *manipulative* capacities. Rather, Dr. Isaac noted that Plaintiff's wrist pain affected her *lifting* abilities. (DE 9, p. 211). Indeed, the ALJ determined that Plaintiff had lifting limitations. (DE 9, p. 16). Dr. Isaac also noted that Plaintiff "denie[d] radicular symptoms including pain, paresthesia, and weakness," and that Plaintiff's Spurling's tests, testing for radicular pain in the neck, were negative. (DE 9, pp. 214, 216, 218, 220, 306).

Even the consultative examiners noted no manipulative limitations. (DE 9, pp. 158, 222-228, 232, 278). Dr. Pinga reported that Plaintiff had "good manual dexterity in the fingers of both hands where she could button her shirt [and] remove and replace the cap in one of her medicine bottles while in the office." (DE 9, p. 225). Dr. Pinga also noted that Plaintiff's wrist joints were not inflamed or deformed and that Plaintiff's right shoulder did not show any swelling or deformities. (DE 9, pp. 225-226).

### 5. The ALJ Correctly Assessed Plaintiff's Postural Limitations

Plaintiff argues that her RFC includes postural limitations as a result of her degenerative arthritis, disc disease of the lumbar spine, lumbar radiculopathy, and bilateral degenerative

arthritis of the knees. (DE 11-1, p. 4). The ALJ properly withheld postural limitations from the RFC after considering the physicians' medical reports and Plaintiff's medication, testimony, and pain triggers.

Aside from Dr. Patton, Plaintiff's treating physicians did not report specific postural limitations. Dr. Patton stated that Plaintiff had difficulty using stairs. (DE 9, p. 190). As discussed below, the ALJ erred when she did not state a good reason for dismissing Dr. Patton's opinion, but this constituted harmless error. Substantial evidence supports the ALJ's RFC assessment.

The ALJ reported that the "consistent lack of clinical findings certainly did not support [Plaintiff's] testimony of excruciating pain." (DE 9, p. 20).[38] Upon referencing objective test results, the ALJ concluded that the Plaintiff suffered from mild to moderate abnormalities. (DE 9, p. 20). The ALJ also summarized Dr. Isaac's examination notes which reported limited ranges of motion in the cervical and lumbar spine. (DE 9, pp. 20, 205-220). While Plaintiff was tender in several regions, Plaintiff had no gross deformity or scoliosis, and the straight leg raise test, Gaenslen's test, FABER test, and facet loading maneuvers which included standing extension and rotation were negative. (DE 9, pp. 205-210, 213-220). Plaintiff had also denied paresthesia in the lower limbs. (DE 9, p. 18). According to Dr. Isaac's notes, Plaintiff's complaints of back and leg pain were related to walking, standing, and sitting, and the ALJ appropriately noted limitations regarding Plaintiff's ability to stand, sit, and walk. (DE 9, p. 215).

The ALJ also considered Plaintiff's pain medication, which included Lortabs, Zanaflex, Tylenol, cortisone injections, a Toradol injection, a Lidoderm patch, a Medrol dose pack, and physical therapy. (DE 9, pp. 18-20). On multiple occasions, Plaintiff's treating physician Dr. Isaac noted that the medication worked well, had no side effects, and had decreased Plaintiff's

_____

[38] Plaintiff testified that the pain was a constant nine out of ten. (DE 9, pp. 33-34).

pain by 40%. (DE 9, pp. 18-20, 207, 213, 215). Although Plaintiff alleged side effects to her medication at the hearing (DE 9, pp. 17, 33), this affects her credibility as it was inconsistent with her reports to Dr. Isaac and DDS in which she denied side effects aside from affecting her blood pressure. (DE 9, pp. 143, 165, 172, 215).

Though the State consulting examiners determined that Plaintiff had minor postural limitations, the ALJ is not bound by these examiners' findings. *See* 20 C.F.R. § 416.927(e)(2)(i). Non-examining sources are considered insofar as their opinions are supported by explanations, and greater weight is given to opinions that are consistent with the record as a whole. 20 C.F.R. § 416.927(c)(3)-(4). Because the non-examining sources concluded that Plaintiff could perform a full range of light work, which exceeded Plaintiff's actual abilities and was not supported by the record, the ALJ appropriately gave their opinions little weight. (DE 9, p. 19).

### a. Dr. Patton Is a Treating Physician

Under the Act, a treating physician is a source who provides or has provided medical treatment or evaluation and who had or has an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. The longevity and frequency of treatments and evaluations are considered in relation to the nature of the claimant's conditions. 20 C.F.R. § 416.902. Essentially, the longer the physician-claimant relationship, the more insight the physician should have into the claimant's impairments, and more weight should be given to the physician's evaluations. *Lambert ex rel. Lambert v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 671, 683 (S.D. Ohio 2012).

A one-time examiner is not a treating physician. *Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp. 2d 739, 743 (W.D. Mich. 2007) (citation omitted). Nor is a doctor a treating physician when he saw the claimant twice but the claimant saw other doctors more frequently for the same complaint. *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 491 (6th Cir. 2005). One forty-five

minute visit and four fifteen-minute follow-ups over a six-month period where the doctor performed the same tests as the claimant's other physicians did not make the doctor a treating physician. *Kane v. Astrue*, No. 1:10CV1874, 2011 WL 3353866, at *5-6 (N.D. Ohio Aug. 3, 2011).

Based on the number of appointments and degree of involvement in treating Plaintiff's knee pain, Dr. Patton was a treating physician. Dr. Patton periodically saw Plaintiff at least four times over the course of six-months, obtained and evaluated a MRI and x-rays of Plaintiff's knees, administered cortisone injections on two occasions, and discussed other forms of pain relief on other occasions. (DE 9, pp. 189-200).

### b. The Treating Physician Rule

Because Dr. Patton was a treating physician, the ALJ was required to give his opinions controlling weight if: (1) his opinions were well-supported by medically acceptable clinical and laboratory diagnostic techniques and (2) his opinions were not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 416.927(c)(2); SSR 96-2p. If an ALJ does not give the treating source's opinion controlling weight, the ALJ must provide a good reason for the weight given and consider the length and nature of the treatment relationship, the supportability of the evidence, the consistency of the opinion with the record as a whole, the physician's specialization, among other factors. 20 C.F.R. § 416.927(c)-(d); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

When assessing Plaintiff's RFC, the ALJ did not give Dr. Patton's opinion controlling weight and erred by not explaining the reasons for the weight given. (DE 9, pp. 16-21). Normally failing to comply with 20 C.F.R. § 416.927 as such would constitute reversible error. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009). However, this Court is not required to

reverse the decision if the ALJ's omission constituted harmless error, such that: (1) "the treating source's opinion [was] so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopt[ed] the opinion of the treating source or [made] findings consistent with the opinion," or (3) if "the Commissioner [ ] met the goal of § [416.927](d)(2)." *Wilson*, 378 F.3d at 547.

An ALJ may meet the goal of 20 C.F.R. § 416.927(d)(2) by indirectly attacking the supportability of the physician's opinion or the consistency of the physician's opinion with the record as a whole. *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (quoting *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2005)). Where an ALJ discusses the physician's opinions "in the context of discussing a multitude of contrary medical evidence," the ALJ meets this regulatory goal. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 748 (6th Cir. 2007). Essentially the ALJ needs to provide sufficient reasons for giving less weight to the doctor's opinion, not just the fact that the ALJ rejected the opinion. *Nelson*, 195 F. App'x at 470 (quoting *Hall*, 148 F. App'x at 464).

### c. The ALJ's Failure to Comply with 20 C.F.R. § 416.927 Was Harmless Error

The ALJ's decision falls within the scope of the third harmless error exception. While the ALJ noted Dr. Patton's diagnoses and the stair-climbing limitation (DE 9, p. 17), the ALJ indirectly dismissed this limitation when discussing Dr. Isaac's and Dr. Pinga's assessments. (DE 9, pp. 17-19). First, the ALJ discussed Dr. Patton's diagnoses of osteoarthritis in both knees and recurrent pas anserine bursal tendinitis in Plaintiff's left knee. (DE 9, p. 17). From Dr. Patton's notes, ALJ summarized that Plaintiff could only flex her knee 90 degrees without increased pain and had difficulty using stairs. (DE 9, p. 17).

The severity of Plaintiff's knee pain and associated limitations as noted by Dr. Patton was not substantiated by other medical opinions. Dr. Isaac, a pain specialist and a treating physician longer than Dr. Patton, reported that Plaintiff ambulated with a normal gait, had an "essentially normal" examination aside from limited motion in the lumbar and cervical spine, had a 5/5 muscle strength, and showed "no evidence of laxity, sublaxation, dislocation, asymmetry, or instability." (DE 9, p. 18). The ALJ also referred to Dr. Isaac's recommendation that Plaintiff should engage in routine aerobic conditioning, stretching, and strengthening. (DE 9, pp. 18, 210).

Dr. Pinga, while only a consulting examiner, supported Dr. Isaac's findings. The ALJ noted Dr. Pinga's assessment that Plaintiff could flex her knees to 120 degrees and had no difficulty getting out of her chair and onto the examination table. (DE 9, p. 19). Dr. Pinga's notes also reflected that Plaintiff had a normal gait and had no edema, tenderness, effusion, deformities, or atrophy in her lower extremities. (DE 9, pp. 19, 223). Although the ALJ erred in not specifying the weight she gave to Dr. Patton's opinions, the ALJ's omission is harmless error and does not require a remand.

### 6. The ALJ Correctly Assessed Plaintiff's Capacity to Sit, Stand, and Walk

Without indicating relevant parts of the record to substantiate her assertions, Plaintiff argues that the ALJ erred in assessing how long Plaintiff could sit, stand, and walk and whether Plaintiff's RFC required a sit-stand option. (DE 11-1, pp. 4-5; DE 13, p. 2). Despite this contention, the record contains substantial evidence supporting the ALJ's conclusion that Plaintiff could stand or walk for four hours in an eight-hour workday, sit for six hours in an eight-hour workday, and did not require an at-will sit-stand option. (DE 9, p. 16).

None of Plaintiff's physicians indicated specific time limitations associated with these activities. Dr. Isaac noted that Plaintiff's pain limited her ability to walk (DE 9, pp. 205, 213,

215, 217, 219), but he also encouraged Plaintiff to engage in aerobic activities. (DE 9, p. 210).

The consultative examiners presented the ALJ with two different RFC assessments. Whereas the

non-examining individuals, Dr. Ryan, Dr. Walwyn, and Ms. Degrella, each indicated that

Plaintiff could walk, stand, and sit for six hours in an eight-hour day (DE 9, pp. 158, 230, 276),

the consultative examiner, Dr. Pinga, indicated that Plaintiff could sit for six hours in an eight-

hour day and could only stand and walk for four hours in an eight-hour day. (DE 9, p. 227). As

Dr. Pinga actually examined Plaintiff and set forth conclusions that were consistent with the

record, the ALJ properly gave great weight to Dr. Pinga's findings. (DE 9, p. 19). *See* 20 C.F.R.

§ 416.927(c)(1),(4). Further, none of Plaintiff's treating physicians, examining physicians, or

non-examining physicians noted that Plaintiff required a sit-stand option.

### E. VOCATIONAL GRIDS

The SSA may use the grids found in 20 C.F.R. pt. 404, subpt. P, app. 2 to meet its burden

at step five of the disability determination process. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847,

855 (6th Cir. 2010). Once the ALJ determines that the claimant can no longer perform past

relevant work, the ALJ considers the grids along with the claimant's RFC, age, education, and

work experience to determine if other work is available. *Id.*

#### 1. Plaintiff Is Not Disabled Under Grids Rule 201.10

Plaintiff claims she is entitled to a partially favorable decision as a matter of law pursuant

to Rule 201.10 of the grids. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, rule 201.10.[39] (DE 11-1, p.

5). On the contrary, the ALJ appropriately applied Rule 202.11.[40]

Under Rule 201.10, a claimant with the same age, education, and work experience as

Plaintiff who is limited to sedentary work is *per se* disabled. *See* 20 C.F.R. pt. 404, subpt. P, app.

---

[39] This rule only applies where the claimant's maximum sustained work capacity is limited to sedentary work.

[40] This rule applies where the claimant's maximum sustained work capacity is limited to light work.

2, rule 201.10. However, a similarly situated claimant with the capacity to perform light work is not disabled. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, rule 202.11. When a claimant's exertional capability falls between two levels of work and only one level would support a finding of "disabled," the ALJ considers "the extent of any erosion of the occupational base and [assesses] its significance." SSR 83-12. The ALJ may consult the VE to determine "whether a significant number of jobs exist in the national economy that a hypothetical individual with the claimant's limitations can perform." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wilson*, 378 F.3d at 548; *see* 20 C.F.R. § 416.966(e); SSR 83-12. As few as "870 jobs can constitute a significant number in the geographic region." *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375 (6th Cir. 2006).

The ALJ determined that Plaintiff was able to perform a limited range of light work and a full range of sedentary work. (DE 9, pp. 20-21, 47-48). As advised by SSR 83-12, the ALJ consulted a VE regarding Plaintiff's borderline functional capacity. (DE 9, pp. 47-48). The VE provided three examples of light work occupations with substantial numbers in the economy that Plaintiff could perform. (DE 9, p. 47).[41] Accordingly, the occupational base was not so eroded as to preclude Plaintiff from performing light work, and the ALJ appropriately consulted Rule 202.11 at the "light work" table. *See Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003) (affirming use of the "light work" table where the claimant could perform limited light work and could perform 2,500 security guard jobs and 1,400 hotel clerk jobs in the Tennessee economy).[42]

---

[41] Plaintiff could work as a sewing machine operator (1,000 jobs in Tennessee and 100,000 in the United States), a production assembler (1,100 jobs in Tennessee and 75,000 in the United States), and an assembly press operator (2,000 jobs in Tennessee and 150,000 in the United States). (DE 9, pp. 47-48).

[42] The Magistrate Judge acknowledges Plaintiff's argument that upon reaching the age of 55 Plaintiff would be entitled to a decision of "disabled" even if she could fully perform a full range of light work. (DE 11-1, p. 21). While this Court only considers Plaintiff's disability status from the date of onset till the date the ALJ's decision became final, the Plaintiff may well be able to re-file for benefits at age 55.

## IV.    RECOMMENDATION

For the reasons stated above, the Magistrate Judge hereby **RECOMMENDS** that Plaintiff's Motion for Judgment on the Administrative Record (DE 11) be **DENIED** and that the Commissioner's decision be **AFFIRMED**.[43]

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from receipt of this Report and Recommendation within which to file with the District Court any written objections to the proposed findings and recommendations made herein. Any party opposing shall have fourteen (14) days from receipt of any objections filed regarding this Report within which to file a response to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 1111 (1986).

**ENTERED** this the 20th day of August, 2013,

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge

---

[43] The Magistrate Judge further finds that Plaintiff's suggestions that the ALJ had a "senior moment" and that the Court should be attuned to the "ominous inferences [that] exist due to racial circumstances" (DE 11-1, p. 19) to be below the dignity of this Court. Not only are these asides inappropriate, but they are also unsubstantiated by the record.